## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ELLEN DIMURO, MARGARET OHAYON, DANA STEIN and all others similarly situated,<br><br>               Plaintiffs,<br><br>   v.<br><br>THE ESTÉE LAUDER COMPANIES, INC., CLINIQUE LABORATORIES, LLC,<br><br>              Defendants. | Civil Action No. 3:12-cv-01789-AVC<br><br><br><br>**CONSOLIDATED CLASS ACTION COMPLAINT and DEMAND FOR JURY TRIAL**<br><br><br>**Dated:  April 8, 2013** |

Plaintiffs, by their attorneys, on behalf of themselves and all others similarly situated, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

### NATURE OF THE ACTION

1.      The search for eternal youth and beauty is hardly new.  For centuries men and women have attempted to forestall the inevitable aging process by cosmetic and surgical means.  Indeed, throughout history there has been no shortage of products, including the infamous "snake oil" tonic from a by-gone era, that purport to "cure" the "disease of old age."

2.      Today, the promises of discovery of a youth potion continue and, like a modern-day snake oil salesman, The Estée Lauder Companies, Inc., through its Clinique branded products manufactured by Clinique Laboratories, LLC and/or

Clinique Laboratories Dist. ("Estée," "Clinique," or "Defendants"[1]), preys on consumers' primal fear of aging and their eternal hope that products exist that can eliminate the signs of aging and effectively turn back time. In fact, Estée goes so far as to claim on the product packaging for its Youth Surge Night Age Decelerating Moisturizer that the product's "youth conserving agents" are "quite like a fountain of youth."

3.     Estée engages in such false, misleading, and/or deceptive conduct because it profits handsomely from its claims that its products, including those from the Repairwear collection, specifically Zero Gravity Repairwear Lift Firming Cream, Repairwear Laser Focus Wrinkle & UV Wrinkle Damage Corrector, Repairwear Uplifting Firming Cream, Repairwear Uplifting Firming Cream Broad Spectrum SPF 15, Repairwear Intensive Night Cream, Repairwear Intensive Eye Cream, and Repairwear Laser Focus Wrinkle Correcting Eye Cream (collectively "Repairwear Products") have specific, de-aging effects on the human skin.

4.     As explained more fully herein, Estée has made, and continues to make, deceptive, false, or misleading claims and promises to consumers about the efficacy of its Repairwear Products in a pervasive, nation-wide marketing scheme

---

[1] Because the precise corporate structure of Defendants is unclear at the time of filing, Plaintiffs reserve the right to add additional defendants should it become necessary as discovery progresses.  In addition, because the products themselves reference Clinique Laboratories Dist., while the advertisements and websites do not, the use herein of one of the Defendants shall not be deemed to exclude any other.  Defendants have made it impossible for a consumer to determine which entity in fact produces, distributes, and sells the various Repairwear Products.

that confuses and misleads consumers about the true nature of the products and the results they are capable of providing.

5.      In reality, the Repairwear Products do not and cannot live up to the efficacy claims Estée made and continues to make.

6.      Estée knows this, yet designs its marketing and advertising campaign to include indicia of scientific research and discovery alongside promises of specific results for the sole purpose of misleading or deceiving consumers.  As a result, Estée's marketing pitch is the same as that of the quintessential snake-oil salesman – Estée dupes consumers with false, misleading, and/or deceptive promises of specific results it knows its products cannot deliver, and does so with one goal in mind – reaping enormous profits.

7.      Indeed, according to its 2010 annual report, Estée's net sales of skin care products increased 12%, or $341.1 million, to approximately $3.227 billion, primarily reflecting its "strategic focus on growing this category through creativity and innovation, particularly high growth segments, such as products that address the visible signs of aging."

8.      An example of Estée's pattern and practice of deceptively marketing Repairwear Products is Estée's statement that the products address the concern of "De-Aging."  This claim suggests to consumers that the Repairwear Products are actually able to reverse the aging process and/or the signs of aging.[2]  Estée makes

---

[2] The prefix "de" means to reverse the action of or to remove.  *See* The American Heritage Dictionary, available at http://americanheritage.yourdictionary.com/de-

this misleading claim despite knowing that no ingredient in its Repairwear Products is able to actually reverse or remove the signs of aging.

9.      Indeed, consumers purchase the Repairwear Products instead of lower-priced moisturizers, which are readily available, to obtain the unique so-called "de-aging" results that Estée promises.

10.     A direct effect of Estée's pervasive and deceptive marketing campaign is that consumers across the country, including Plaintiffs and the other members of the proposed nationwide Class and Subclasses, were exposed to Estée's false, misleading, and/or deceptive misrepresentations and purchased skin-care products that do not, and cannot, provide the results Estée promises.

11.     Estée's false, misleading, and/or deceptive statements about the efficacy of a particular product are equally applicable to each of the Repairwear Products.  For example, Estée specifically promises that the unique Repairwear formula will rebuild firming collagen and cause wrinkles to "disappear" by 63% (face) and 54% (eye area) respectively.   Accordingly, because Estée repeats essentially the same misleading efficacy promises for each of the Repairwear Products, the misleading claims touting the supposed benefits are equally applicable to all of the Repairwear Products.

12.     Moreover, on the Clinique web page that loads when a consumer clicks on the concern of "De-Aging" (*see* screen shot below), Estée makes the following efficacy claims without regard to any one specific product: "Defend &

---

prefix, last accessed 12/20/12; Webster's New World Dictionary, available at http://websters.yourdictionary.com/de-prefix, last accessed 12/20/12.

Rescue: Protect skin from the visible effects of emotional and environmental stresses"; "Repair Lines & Wrinkles: De-aging powerhouses work to repair and help slow visible aging 24/7"; "Firm & Lift Contours: Help skin rebuild firming natural collagen to appear smoother, more lifted."   Because none of these false and misleading efficacy claims are product specific, consumers seeking information about products that purport to address "De-Aging" concerns are exposed to broad-based efficacy claims that encompass multiple Repairwear Products.



13.     Estée's marketing campaign for each of the Repairwear Products follows the same deceptive pattern and practice – Estée makes specific efficacy promises supported, for example, by pseudo-scientific references or purported "Real Before and After" photos that deceive and mislead consumers into believing that

Repairwear Products will provide the promised results. Such promises are deceptive and/or misleading.

14.     Estée sells its Repairwear Products to consumers in a different manner than other brands of less expensive wrinkle creams or moisturizers are sold, which affects the manner in which Plaintiffs and members of the Class and Subclasses are exposed to the false, misleading and/or deceptive claims.    While lower-priced wrinkle creams are available on the shelves of drug stores and supermarkets, the Repairwear Products are sold mainly over counters at high-end department stores. Sales persons who are specifically trained and compensated by Estée to sell its Repairwear Products, and who are provided with a regularly updated reference "Sourcebook" touting the efficacy claims for each of its products, routinely occupy the counters where Estée also provides consumers access to product displays and sales brochures.

15.     Accordingly, instead of making a side-by-side comparison of product packaging on store shelves, consumers of the Repairwear Products decide to purchase these products almost exclusively by virtue of Estée's uniform advertising and marketing campaigns that reach consumers before they enter the retail outlets (*i.e.*, print media advertisements, television commercials or internet marketing) or via point-of-sale advertising and marketing.

16.     Plaintiffs and the other members of the nationwide Class and Subclasses were exposed to Estée's pervasive, false, misleading and/or deceptive

advertising and marketing messages and material omissions regarding the efficacy promises of the Repairwear Products.

17.    Plaintiffs seek relief in this action individually and as a class action on behalf of all purchasers in the United States of at least one of the Repairwear Products ("the Class") at any time from the date of product launch for each of the Repairwear Products to the present (the "Class Period") for violation of consumer protections laws including, the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a, *et seq.*, the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. §58:8-1, *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.,* breach of express warranty, unjust enrichment, and for violations of the consumer fraud laws and express warranty laws of the various states. Pending completion of discovery, Plaintiffs may seek leave to amend the Class definitions.

18.    Plaintiff Ellen DiMuro ("Plaintiff DiMuro") seeks relief individually, on behalf of a nationwide class, and on behalf of a subclass of residents of her home state of Connecticut.

19.    Plaintiff Margaret Ohayon ("Plaintiff Ohayon") seeks relief individually, on behalf of a nationwide class, and on behalf of a subclass of residents of her home state of New Jersey.

20.    Plaintiff Dana Stein ("Plaintiff Stein") seeks relief individually, on behalf of a nationwide class, and on behalf a subclass of residents of her home state of Illinois.

## THE PARTIES

21.    Plaintiff DiMuro is a citizen of the State of Connecticut, residing in New Haven County.  In or about November or December 2010, Plaintiff DiMuro purchased Repairwear Intensive Night Cream from Macy's department store in Milford, Connecticut at the Westfield Shopping Town mall and on the Clinique website.  Both of these purchases were for full retail price and for personal use. Plaintiff DiMuro saw, read, and received Estée's material misrepresentations in print advertisements, on the Clinique website, and at the point of sale, as described more fully herein, including Estée's many false, misleading, and/or deceptive product claims and relied on those material mis-statements in making her decision to purchase Repairwear Intensive Night Cream.  As detailed more fully herein, Estée promises that its Repairwear Intensive Night Cream is "guaranteed" to "rebuild[] stores of firming natural collagen"; "work[] all night to help block and mend the look of lines and wrinkles"; and provide other guaranteed "de-aging" results.  Plaintiff DiMuro would not have purchased Repairwear Intensive Night Cream had Estée not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

22.    Plaintiff Ohayon is a citizen of the State of New Jersey, residing in Bergen County.  Over the course of the last two years, Plaintiff Ohayon purchased Clinique Repairwear Laser Focus Wrinkle & UV Wrinkle Damage Corrector from Bloomingdale's department store at the mall in Paramus, New Jersey for full retail price and for personal use.  Plaintiff Ohayon saw, read, and received Estée's

material misrepresentations in print advertisements, and at the point of sale, including Estée's many false, misleading, and/or deceptive product claims, and relied on those material mis-statements in making her decision to purchase the Repairwear Products.  Those product claims include, but are not limited to, Estée's promises that Repairwear Laser Focus Wrinkle & UV Wrinkle Damage Corrector is "guaranteed" to "deliver[] an obvious reduction in lines and wrinkles"; that it is "proven to deliver 63 percent of the visible wrinkle-reducing power of a laser procedure"; that it "visibly help[s] repair lines and wrinkles"; and "works to mend sun's visible damage."  Plaintiff Ohayon would not have purchased Repairwear Laser Focus Wrinkle & UV Wrinkle Damage Corrector had Estée not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

23.    Plaintiff Stein is a citizen of the State of Illinois, residing in Lake County.  In or about February 2011, Plaintiff Stein purchased Repairwear Intensive Eye Cream from Macy's department store in Vernon Hills, Illinois for full retail price and for personal use.  Plaintiff Stein saw, read, and received Estée's material misrepresentations at the point of sale, as described more fully herein, including Estée's many false, misleading, and/or deceptive product claims and relied on those material mis-statements in making her decision to purchase Repairwear Intensive Eye Cream.  Those product claims include, but are not limited to, Estée's promises that Repairwear Intensive Eye Cream is "guaranteed" to "stimulate[] skin's natural repair functions"; "strengthen[] vulnerable skin"; and "target[] the appearance of

lines."  Plaintiff Stein would not have purchased Repairwear Intensive Eye Cream had Estée not made such false, misleading, and/or deceptive claims and instead disclosed the true nature of its products.

24.     Defendant The Estée Lauder Companies, Inc. is a Delaware corporation with its principal place of business in New York, New York.

25.     Defendant Clinique Laboratories, LLC is a subsidiary of The Estée Lauder Companies, Inc., with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)  because there are more than 100 class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from a Defendant.

27.     Pursuant to 28 U.S.C. §1391, venue is proper in this Court because Defendants conduct business in this District and a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## GENERAL FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.  Estée's Misleading Efficacy Claims

28.     A central theme of Estée's deceptive marketing campaign for the Repairwear Products, which permeates throughout its print and web-based advertisements, product packaging, sales brochures, and in-store displays, is that the Repairwear Products will provide guaranteed de-aging results.

29.   For example, among other things, and in addition to the efficacy claims applicable to all of the Repairwear Products, Estée specifically promises:

Repairwear Intensive Night Cream
- Works all night to help block and mend lines and wrinkles.
- Rebuilds stores of firming natural collagen.
- Fuels 24-hour antioxidant replenishment that arms skin for tomorrow.
- An antioxidant booster, it helps create firmer skin by rebuilding skin's reserves of natural collagen.
- Arms skin for tomorrow with a skin-defending infusion of teas and vitamins.

Repairwear Laser Focus Wrinkle & UV Wrinkle Damage Corrector
- In 4 weeks, this product delivers an obvious reduction in lines and wrinkles while improving skin's overall texture.
- Provides high-level peptides to boost the production of natural collagen and a patented enzyme blend that works to mend visible UV-damage.
- Based on decades of scientific research, this potent serum enlists peptides to visibly help repair lines and wrinkles.
- A patented enzyme blend also works to mend sun's visible damage.
- At 12 weeks, its visible wrinkle-reducing power comes remarkably close to the profound wrinkle repairing results of a dermatological laser procedure.
- **Research results:**
  Proven to deliver 63 percent of the visible wrinkle-reducing power of a laser procedure at 12 weeks.
- Wrinkle and UV damage corrector.
- What are the long-term benefits?
  For one, visible wrinkle reduction of many dimensions. The length, depth and number will be significantly and visibly reduced.
- And skin's future is brighter because antioxidants impede future damage.
- Promote natural cellular repair
- Protect cells from oxidative damage
- Visibly repairs UV Damage

Repairwear Intensive Eye Cream
- **What it is formulated to do:**
  This potent antiaging eye cream stimulates skin's natural repair functions, specifically targeting the appearance of eye-area lines and wrinkles. It replenishes antioxidants to strengthen vulnerable skin for a brighter, more vibrant, and refreshed look.
  Potent moisturizer to repair and prevent the appearance of lines, wrinkles.
- Strengthens thin skin.

- Focuses skin's energies on repair of eye-area wrinkles.

<u>Repairwear Laser Focus Wrinkle Correcting Eye Cream</u>
- See your entire eye area visibly improved starting in 4 weeks.
- Then, we went beyond our usual clinical testing and invented a unique test to prove "smile lines" around eyes disappear by 54% in 12 weeks.
- Builds natural elastin to visibly reduce lines, wrinkles.
- Helps visibly repair UV damage to improve texture.
- Leverages groundbreaking science on repair with proven innovation in retexturing damaged skin.
- A patented complex uses natural light to trigger a more targeted search for damage, making natural repair more productive.

<u>Zero Gravity Repairwear Lift Firming Cream</u>
- To firm up, you don't have to move a muscle – just let this power formula help skin "defy" gravity.  It achieves this uplifting feat by helping skin rebuild firming natural collagen.
- An instant firming sensation goes on to deliver visible, measurable lift and firming cushion, fueled by a Peptide complex. (That's proteins, if you didn't know.) Patented* formula helps block and mend the look of lines and wrinkles.

<u>Repairwear Uplifting Firming Cream</u>
- Helps restore dermal cushion in as little as 4 weeks.
- Moisture-rich cream boosts natural elastin and collagen – the stuff that gives skin its snap.
- Helps organize skin into a tighter, stronger network.
- Helps rebuild elasticity and firmness, helps visibly smooth out laugh lines from nose to mouth
- New firmness helps visibly sculpt jawline
- Strengthen and rebuild skin's elasticity and resistance to gravity
- Targeted wrinkle and UV damage repair

<u>Repairwear Uplifting Firming Cream Broad Spectrum SPF 15</u>
- Light, richly moisturizing cream that visibly tightens, lifts and firms the face and neck to rebuild skin's youthful appearance with the added important SPF15 protection benefit.
- The unique formula helps empower skin to "defy" gravity by helping rebuild firming natural collagen.

30.    The foregoing efficacy claims are false, misleading, and/or deceptive.

31.     In fact, although such scientific-sounding claims provide the Repairwear Products with an increased level of credibility among unsuspecting consumers, they are simply part and parcel of Estée's deceptive and misleading advertising campaign.

32.     One of the reasons Estée saturates its marketing campaigns with misleading scientific references is to create the perception that the Repairwear Products have drug-like efficacy, when, in fact, they do not.  Estée knows, or should know, that such a perception will increase sales of the Repairwear Products. Indeed, if Repairwear Products actually "deliver 63 percent of the visible wrinkle-reducing power of a laser procedure," "rebuild elasticity or firmness," "rebuild stores of natural collagen," "empower skin to defy gravity," "organize skin into a tighter, stronger network," "intensif[y] natural cellular repair," "mend sun's visible damage," "visibly sculpt jawline," "strengthen and rebuild skin's elasticity and resistance to gravity," "smooth out 'laugh lines' from nose to mouth," "repair lines and wrinkles," or provide the other promised  "de-aging" results described herein, they would affect the structure or function of the human body and therefore be regulated as a drug.

33.     Estée relies on promises of specific "de-aging" results backed up by the indicia of purported scientific reliability (*e.g.*, patents, tests, "dermatological solutions," and comparison to cosmetic procedures, like laser treatments) because it knows that such science-oriented claims render consumers more likely to believe

the efficacy promises, and therefore more likely to purchase its Repairwear Products.

34.     Even if one or more of Estée's efficacy claims is literally true, when viewed in their totality, the promises Estée makes regarding the efficacy of the Repairwear Products are nevertheless misleading to consumers and are, therefore, actionable regardless of their literal truthfulness.

## II.    Clinique's Misleading and Deceptive Visualization and "Real Before and After" Tools

35.     Estée compounds its false, misleading and deceptive efficacy claims by providing consumers with illustrations of the results consumers can expect from using its products.   Indeed, a central component of Clinique's website allows consumers to visualize their specific results through Clinique's "Virtual Skin Care Tool."



36.     This online marketing tool promises that customers can:

> See for yourself what Repairwear Laser Focus can do for your skin. This virtual preview will show you the potential wrinkle reducing effects after 12 weeks of consistent use. What you'll notice: a softening of lines, wrinkles, sun damage. Get started now and discover results remarkably close to a dermatological laser procedure – 63% to be exact.

37.     In order to "see for themselves," consumers have the option to upload their own photograph so that they can see the personalized changes that Estée promises by using the Repairwear Product.

38.     If the consumer does not have a picture available, Estée provides the option of "selecting a model" to see the "Real Before and After" results, which are then presented as a series of pictures that purport to show how the Estée product eliminates wrinkles:



39.     While Estée claims, via an asterisk with microscopically small type at the bottom of the page, that its "Visualize Your Results" section is a mere "dramatization," and that "actual result[s] may vary," Estée affirmatively claims that the results "dramatiz[ed]" actually do "represent[] average results."

40.     The combination of these two contradictory concepts – a dramatization that supposedly represents actual average results – is deceptive and misleading to consumers, because a dramatization, by its very nature, does not depict actual or real results – it is a fictional interpretation.  Thus, even if consumers read the small print referenced by the asterisk, they are left with the impression that they will obtain, on average, the results "dramatized" in the picture, which are, in reality, impossible to obtain.

41.     Estée further compounds its deception by providing consumers with what it claims are "Real Before and After" results, both over time and instantly:

<u>**Over Time**</u>:



**Instant Results**:



42.    These "Real Before-and-Afters," which are also found in the product brochures Estée provided at Clinique's in-store sales counters, do not have any disclaimers and therefore leave consumers with the impression that the results pictured can be expected when consumers decide to purchase the Repairwear Products.

43.    Such "Real Before and After" pictures and visualizations further reinforce the false, misleading, and/or deceptive efficacy promises Estée makes with respect to these products and falsely represents to consumers that using the Repairwear Products will erase or remove their wrinkles. Unfortunately for consumers, these promises are demonstrably false –the Repairwear Products cannot remove wrinkles or provide the other "de-aging" benefits Estée promises.

### III.    Guaranteed Results



44.    Estée outfits its Clinique sales counters at many department stores with displays (such as the one appearing above) that include iPads with an application devoted to assisting consumers in selecting Repairwear Products.  The application, which is also accessible to consumers on the Clinique website, asks a series of questions pertaining to skin concerns, processes over 180,000 product combinations, and culminates in a "Skin Consultation Printout" that identifies Clinique-recommended products and a "customized plan with results guaranteed."

45.    Thus, through the use of this point-of-sale marketing tool, Estée promises that no matter what combination of answers a consumer gives to the application questions (out of more than 180,000 possible combinations), the

recommended products, including the Repairwear Products, will provide results that are guaranteed.

## IV.   Product Cycles

46.     To perpetuate its deceptive and misleading scheme, Estée has a short product cycle, releasing new Clinique products every few years based upon some new "research" or purported new ingredient.

47.     Estée maintains this short product cycle in order to falsely tout its new products via a re-imagined marketing campaign in order to keep driving sales and profits that would otherwise stagnate once consumers used the existing products and realized that they do not perform as promised.

48.     This scheme is evidenced by the fact that Estée discontinues sales and production of its older Clinique products once new products are introduced to the market, despite the fact that the discontinued products provide seemingly amazing efficacy results based on scientific breakthroughs.

49.     For example, Zero Gravity Repairwear Lift Firming Cream has been discontinued despite the fact that it was made of a patented formula that purportedly "deliver[ed] visible, measureable lift and firming cushion, fueled by a Peptide complex" and "enhances skins natural collagen production."

50.     Estée's discontinuation of purportedly effective products, like Zero Gravity Repairwear Lift Firming Cream, from the market demonstrates that Estée's promised benefits are illusory and nothing more than deceptive marketing.

## V.   Estée's Pervasive and Misleading National Marketing Campaign

51.   Estée's pervasive false, misleading, and/or deceptive national marketing campaign includes the dissemination of deceptive advertising and marketing through a variety of media including, but not limited to, Internet, television, and print publications.   Many of the same deceptive and misleading statements are also printed on the product handouts, product packaging, and sales brochures that are made available by Estée to consumers at Clinique counters in department stores.

### A.   Internet and Television Marketing

52.   Estée's Internet marketing includes, among other things, video presentations, Facebook, Twitter, direct-to-consumer email marketing, and information on its own website, www.clinique.com.   Many of its commercials and promotional videos are also readily accessible on YouTube (www.youtube.com) and on third party websites such as www.macys.com.   Each of these sources provides consumers access 24 hours a day, 7 days a week, to Estée's deceptive advertising of these products.

53.   For example, this television commercial for Repairwear Laser Focus Wrinkle and UV Damage Corrector, which is currently available on www.clinique.com, www.youtube.com, and other third party websites, purports to show the benefits of using the Repairwear Laser Focus Wrinkle and UV Damage Corrector.   These promised benefits include similar efficacy claims as those made by Estée in its other marketing materials, such as the product's ability to "smooth

lines" and "repair UV damage."   The commercial goes on to direct consumers to www.clinique.com where they can see for themselves the "proof" of the benefits of Repairwear, which, as discussed above, includes use of the misleading Virtual Skin Care tool and the "Real Before-and-Afters." (discussed in part II):



Now Clinique says, forgive the past



Protect the future



A serum that helps visibly…



…repair UV damage



Improves skins' texture



And smoothes eye-area lines and wrinkles.  The difference will astound you.



See 63% of…



…the visible wrinkle reducing power of a dermatological laser procedure.



Now a second chance for every skin.



Repairwear Laser Focus from Clinique.



B. <u>Print Media and Sales Brochures</u>

54.     Estée also markets its Repairwear Products in print publications, including by placing advertisements in such widely circulated magazines as Glamour, Cosmopolitan, Allure, Good Housekeeping, Redbook, and Ladies Home Journal among others, and in other forms of direct-to-consumer marketing.

55.     The specific dates and places of each of Estée's advertisements for Repairwear Products are in the possession of Defendants.

56.     Plaintiff DiMuro and Plaintiff Ohayon read and were exposed to Estée's advertisements for Repairwear Products in magazines including Good Housekeeping, Redbook, and Ladies Home Journal, among others, prior to and after making their purchases.   The representations in the magazine advertisements viewed by Plaintiff DiMuro and Plaintiff Ohayon influenced their decisions to purchase Repairwear Products.

57.     Estée also distributes sales brochures and product handouts at department stores where the Repairwear Products are sold.  These sales brochures and product handouts contain much of the same deceptive or misleading efficacy claims as those that appear on the Clinique website and in other advertising media.

58.     For example, in one of its sales brochures, Estée touts that Repairwear Intensive Eye Cream will "repair and prevent the appearance of lines, wrinkles." This efficacy claim is misleading to consumers on multiple levels.  First, it makes no sense to claim that a product can "repair" the *appearance* of something, so the only logical interpretation of this claim is that the product can actually repair the lines and wrinkles themselves (compared to "reducing" the appearance of lines, wrinkles). Similarly, the "prevent" claim only makes sense if consumers conclude that Estée is promising that the product can prevent lines and wrinkles from appearing in the first instance -- as opposed to preventing the appearance of lines and wrinkles that already exist (an obvious impossibility).  In fact, while the use of the "appearance of lines, wrinkles" language is an attempt by Estée to remedy the deceptive nature of the marketing message, the attempt fails because it conveys a conflicting and misleading message.  Consumers are therefore left with the false, misleading, and/or deceptive impression that Repairwear Intensive Eye Cream will actually "repair" their lines and wrinkles and/or "prevent" their lines and wrinkles from appearing in the first place.

59.     The use of the "repair" and "prevent" language is a clear attempt by Estée to separate itself from more common efficacy claims such as "reduces the appearance of lines and wrinkles."  Estée intentionally makes the choice to convey a more highly efficacious – and more misleading – message in order to convince consumers that its products are superior to its competitors, and therein drive greater sales and profits.

60.     Another example of the in-store sales brochures provided by Estée for the Repairwear Products is the following, which regurgitates many of the same efficacy claims made elsewhere and contains the same "Real Before and After" images as the Clinique website:



## Repair lines and wrinkles.

### Day and night

☐ Repairwear Laser Focus
Wrinkle & UV Damage Corrector
In 4 weeks, see obvious reduction in wrinkles and improved texture from sun damage. At 12 weeks, see 63% of the wrinkle-reducing power of a dermatological laser procedure. Different commitment, different results, and yet impressive results guaranteed. 

### By day

☐ Youth Surge Age Decelerating
Moisturizer Broad Spectrum
SPF 15
Thanks to youth-extending agents, lines and wrinkles seem to evaporate, replaced by plump, vibrant skin. With UVA/UVB protection. 

My Skin-Typed formula _____

### By night

☐ Youth Surge Night
Age Decelerating Night
Moisturizer
Intensifies the natural nightly cycle of natural repair to visible effect. Skin looks rested, vibrant. 

My Skin-Typed formula _____

How Repairwear Laser Focus softens
the look of lines, wrinkles and sun damage



Before



After 12 weeks

## **De-Aging Solutions**

## Firm, lift contours.

With formulas that help empower skin to "defy" gravity by helping rebuild firming natural collagen. Skin appears smoother, more lifted.

### By day

☐ Repairwear Uplifting Firming Cream
Broad Spectrum SPF 15
Fortifying moisture cream helps skin build natural collagen. Helps protect skin's support network from
UVA/UVB damage.
Even uses sunlight to turn on powerful repair ingredients. Moisturizes all day 

My Skin-Typed formula _____

### By night

☐ Repairwear Uplifting Firming Cream
Richly moisturizing formula focuses on two paths to perkier skin: one boosts natural elastin and collagen, the other helps preserve and organize it all into a
tighter, stronger
network. It's the kind of whole-face awakening that makes people ask if you've been on vacation. 

My Skin-Typed formula _____



29

C. Sales Representatives

61.    Upon information and belief, Estée also provides training and disseminates uniform information, including a regularly updated "Sourcebook" detailing the false, misleading, and/or deceptive efficacy claims, to Estée sales-persons who work the Clinique counters at department stores like Macy's and others.

62.    These department store sales representatives, to whom Estée provides a portion of their compensation, are trained by Estée to parrot and reinforce the same purported benefits of using the Repairwear Products as contained in Estée's other forms of advertising.

## VI.  The Effect of Estée's Deceptive Conduct

63.    Ignoring the inability of the Repairwear Products to provide the promised results, Estée's pervasive false, misleading, and/or deceptive marketing campaign leaves consumers with the impression that its products are uniquely able to provide certain de-aging effects on human skin.

64.    Estée is aware that, because of the aging population, consumers are increasingly susceptible to such deceptive marketing and advertising and that such marketing and advertising will continue to yield it ever-greater profits. Indeed, according to Estée's CEO, Fabrizio Freda, the aging population "should create greater demand for our anti-aging skincare products."

65.    Estée is also in a position to actually know, or should know, that the de-aging results it represents that its Repairwear Products can deliver are actually

impossible to attain through their use; *i.e.* its Repairwear Products cannot "deliver 63 percent of the visible wrinkle-reducing power of a laser procedure," "rebuild elasticity or firmness," "rebuild stores of natural collagen," "empower skin to defy gravity," "organize skin into a tighter, stronger network," "intensif[y] natural cellular repair," "mend sun's visible damage," "visibly sculpt jawline," "strengthen and rebuild skin's elasticity and resistance to gravity," "smooth out 'laugh lines' from nose to mouth," "repair lines and wrinkles," or provide the other promised de-aging results described herein.  Estée fails to disclose that its Repairwear Products fail to perform as promised.

66.    Estée compounds this deception with misleading "Real Before and After" photos and the personalized visualization of results via the Virtual Skin Care Tool that purport to demonstrate expected results, further enticing consumers to purchase and use Repairwear Products.   Estée's efficacy claims based on "dramatized" promises of actual performance are a material and important factor in its marketing campaign because Estée knows that consumers are more likely to believe efficacy promises, and purchase Repairwear Products, when they can see the "Real Before and After" results.

67.    In addition to the misrepresentations as described herein, Defendants' actions are likewise actionable based on their material omissions, which similarly induced Plaintiffs and the other members of the Class and Subclasses to purchase the Repairwear Products.  For example, among other things, Defendants have failed to disclose the following:

- That none of the Repairwear Products provide unique benefits that cannot be found in other, less expensive products;

- That the "Real Before and After" pictures are not typical of actual results for consumers; and

- That no ingredient in any of the Repairwear Products can actually "de-age" the skin.

68.     As a result of its deceptive conduct, Estée has enjoyed increased sales and thus has reaped massive profits.  Such enormous profits would not have occurred but for Estée's deceptive and misleading marketing and advertising campaign.

69.     Estée charges a premium for its Repairwear Products.  Plaintiffs and the other members of the Class and Subclasses would not have paid premium prices for the Repairwear Products – or would not have purchased the Repairwear Products at all – had they known the truth regarding those products.

70.     Moreover, Plaintiffs and the other members of the Class and Subclasses believed they were purchasing Repairwear Products that would provide the promised de-aging benefits as detailed herein.  In reality, although Plaintiffs and the other members of the Class and Subclasses paid for these unique and specific Repairwear benefits, they did not get what they paid for.  Instead, the products Plaintiffs and the other members of the Class and Subclasses purchased could not, and did not, provide the promised "de-aging" results.

71.     Plaintiffs' claims are not based on the inherent faults in Estée's purported clinical data, studies, or surveys.  Indeed, while this "data" is part and parcel of the false, misleading, and/or deceptive advertising, Plaintiffs intend to

prove, through expert testimony and through information they believe will be revealed in discovery, that Estée's advertising and marketing for the Repairwear Products, as detailed herein, is profit driven and contains efficacy promises that the products simply cannot and do not deliver.

72.     Accordingly, and because of Estée's deceptive advertising and marketing, Plaintiffs and the other members of the Class and Subclasses have been and continue to be harmed in their purchases of the Repairwear Products.

## CLASS ACTION ALLEGATIONS

73.     Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3) on behalf of the following nationwide consumer class (the "Class"):

> All purchasers of at least one of the Repairwear Products in the United States from date of product launch to the present (the "Class Period").

74.     Plaintiff DiMuro also seeks to represent a subclass defined as all members of the Class who purchased one or more Repairwear Products in Connecticut (the "Connecticut Subclass").

75.     Plaintiff Ohayon also seeks to represent a subclass defined as all members of the Class who purchased one or more Repairwear Products in New Jersey (the "New Jersey Subclass").

76.     Plaintiff Stein also seeks to represent a subclass defined as all members of the Class who purchased one or more Repairwear Products in Illinois (the "Illinois Subclass").

77.     Excluded from the Class are Defendants, their parent, subsidiaries and affiliates, their directors and officers and members of their immediate families; also excluded are any federal, state or local governmental entities, any judicial officers presiding over this action and the members of their immediate family and judicial staff, and any jurors assigned to this action.

78.     Members of the nationwide Class and the Connecticut, New Jersey, and Illinois Subclasses are so numerous that their individual joinder herein is impracticable.  Members of each of these classes number in the tens of thousands. The precise number of Class and Subclass members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.  Class and Subclass members may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Defendants and third party sales people.

79.     Common questions of law and fact exist as to all Class and Subclass members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> (a)     whether Defendants breached an express warranty made to Plaintiffs and the other members of the Class and Subclasses;
>
> (b)     whether Defendants were unjustly enriched by their conduct;
>
> (c)     whether Defendants advertise or market the Repairwear Products in a way that is false, misleading and/or deceptive;
>
> (d)     whether Defendants concealed from Plaintiffs and the other members of the Class and Subclasses that their Repairwear Products do not provide the promised results;

(e)     whether, by the misconduct set forth in this Complaint, Defendants have engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sales of their Repairwear Products;

(f)     whether Defendants violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§42-110a, *et seq.*;

(g)     whether Defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. §58:8-1, *et seq.*;

(h)     whether Defendants violated the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq.*;

(i)     whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and the other members of the Class and Subclasses are entitled to restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief.

80.     Plaintiffs' claims are typical of the claims of the other members of the Class and Subclasses as all members of the Class and Subclasses are similarly affected by Defendants' wrongful conduct.  Plaintiffs have no interests antagonistic to the interests of the other members of the Class and Subclasses.  Plaintiffs and all other members of the Class and Subclasses have sustained economic injury arising out of Defendants' violations of common and statutory law as alleged herein.

81.     Plaintiffs are adequate representatives of the Class and respective Subclasses because their interests do not conflict with the interests of the other Class and Subclass members they seek to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class and respective Subclass members will be fairly and adequately protected by Plaintiffs and their counsel.

82.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the other members of the Class and Subclasses.  Each individual Class or Subclass member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.   In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CLAIMS ALLEGED

### COUNT I
### (Violations of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §§42-110a, *et seq.*)

83.     Plaintiffs repeat the allegations contained in paragraphs 1-82 above, as if fully set forth herein.

84.     Plaintiff DiMuro brings this claim individually and on behalf of the other members of the Connecticut Subclass.

85.     Defendants' actions alleged herein were carried out in the conduct of their primary business described above, which includes "the offering for sale … [of a] commodity or thing of value in this state."  Conn. Gen. Stat. §42-110a(4).  Thus, Defendants' actions occurred "in the conduct of any trade or commerce."  Conn. Gen. Stat. §42-110b(a).

86.     Defendants' actions alleged herein have violated CUTPA in that they constituted unfair acts and/or deceptive practices prohibited by CUTPA because Defendants are in a position to actually know, or should know, that the results they promise with respect to the Repairwear Products are impossible, *i.e.* Repairwear Products cannot "deliver 63 percent of the visible wrinkle-reducing power of a laser procedure," "rebuild elasticity or firmness," "rebuild stores of natural collagen," "empower skin to defy gravity," "organize skin into a tighter, stronger network," "intensif[y] natural cellular repair," "mend sun's visible damage," "visibly sculpt jawline," "strengthen and rebuild skin's elasticity and resistance to gravity," "smooth out 'laugh lines' from nose to mouth," "repair lines and wrinkles,"  or provide the other promised de-aging results described herein.  Thus, Defendants' acts and/or practices as alleged herein were unfair and/or deceptive, in part, because:

a.     they violate Conn. Agencies Regs. § 42-110b-18, which prohibits false advertising in that Defendants made untrue and misleading efficacy statements relating to the Repairwear Products, made with intent to induce consumers to purchase the Repairwear Products, regarding which statements

Defendants knew, or which by the exercise of reasonable care should have known, to be untrue and misleading;

b.     they offended public policy or are within at least the penumbra of common laws or statutes and/or other established concepts of unfairness, were immoral, unethical, oppressive or unscrupulous; and/or

c.     they were done with a reckless indifference to the rights of Plaintiff DiMuro and the other members of the Connecticut Subclass or were an intentional and wanton violation of those rights.

87.    Plaintiff DiMuro and the other members of the Connecticut Subclass suffered ascertainable loss of money or property as a result of Defendants' unfair acts and/or deceptive practices.   Specifically, Plaintiff DiMuro and the other Connecticut Subclass members suffered injury as a result of Defendants' false advertising because they were induced to purchase or paid a price premium due to the misleading advertising, marketing, packaging, labeling and other promotion of Repairwear Products.

88.    Because of Defendants' false advertising, Plaintiff DiMuro and the other members of the Connecticut Subclass did not receive what they bargained for. Defendants' conduct is the sole proximate cause of the harm suffered by Plaintiff DiMuro and the other members of the Connecticut Subclass.

89.    Indeed, Plaintiff DiMuro's and the other Connecticut Subclass members' purchases are of no value because the Repairwear Products do not provide the advertised de-aging benefits.

90.     Upon filing the initial complaint, Plaintiff DiMuro mailed a copy of the complaint to the Connecticut Attorney General and the Connecticut Commissioner of Consumer Protection.

## COUNT II
### (Violation of the New Jersey Consumer Fraud Act, N.J.S.A. §58:8-1, *et seq.*)

91.     Plaintiffs repeat the allegations contained in paragraphs 1-82 above, as if fully set forth herein.

92.     Plaintiff Ohayon brings this claim individually and on behalf of the other members of the New Jersey Subclass.

93.     Defendants misrepresented that the Repairwear Products would provide certain permanent de-aging results including, but not limited to Defendants' representations that the Repairwear Products "deliver 63 percent of the visible wrinkle-reducing power of a laser procedure," "rebuild elasticity or firmness," "rebuild stores of natural collagen," "empower skin to defy gravity," "organize skin into a tighter, stronger network," "intensif[y] natural cellular repair," "mend sun's visible damage," "visibly sculpt jawline," "strengthen and rebuild skin's elasticity and resistance to gravity," "smooth out 'laugh lines' from nose to mouth," "repair lines and wrinkles," or provide the other promised de-aging results as described herein.

94.     Defendants' claims that such de-aging benefits were the result of unique scientific discoveries are further deceptive or misleading, as are the references to "Real Before and After" photos, among other things, as described herein.

95.    Defendants' affirmative misrepresentations constitute an unconscionable commercial practice, deception, fraud, false promise and/or misrepresentation as to the nature of the goods, in violation of the NJCFA.

96.    Defendants' knowing and intentional omissions as described herein constitute a violation of the NJCFA.

97.    Plaintiff Ohayon and the other New Jersey Subclass members suffered an ascertainable loss caused by Defendants' misrepresentations and omissions because they were induced to purchase, or paid a price premium, due to the misleading and false advertising and deceptive promises of de-aging efficacy of the Repairwear Products, when, in fact, those qualities did not exist.

98.    Simply put, Plaintiff Ohayon and the other New Jersey Subclass members paid for the advertised benefits of the Repairwear Products and did not get what they paid for.

99.    Indeed, Plaintiff Ohayon's and the other New Jerse Subclass members' purchases are of no value because the Repairwear Products do not provide the advertised de-aging benefits.

### COUNT III
### (Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*)

100.    Plaintiffs repeat the allegations contained in paragraphs 1-82 above, as if fully set forth herein.

101.    Plaintiff Stein asserts this claim individually and on behalf of the other Illinois Subclass members.

102.    Throughout the Class Period, Plaintiff Stein and the other members of the Illinois Subclass and Defendants were "persons" within the meaning of 815 ILCS 505/1(c).

103.    Throughout the Class Period, Defendants conducted "trade" and "commerce" within the meaning of 815 ILCS 505/1(f) by its advertising, offering for sale, and sale of Repairwear Products.

104.    Throughout the Class Period, Plaintiff Stein and the other members of the Illinois Subclass were "consumers" within the meaning of 815 ILCS 505/1(e).

105.    Under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UTPA"), 815 ILCS 510/2, in the conduct of any trade or commerce is unlawful whether any person has in fact been misled, deceived or damaged thereby.

106.    Under Section of the 2 of the UTPA, 815 ILCS 510/2, a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, the person represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.  815 ILCS 510(2)(a)(5). Defendants violated this provision by representing, during the course its trade and business practices, that the Repairwear Products provide de-aging benefits as described herein, when they do not.

107.   Under Section of the 2 of the UTPA, 815 ILCS 510/2, a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, the person "represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another." 815 ILCS 510/2(a)(7). Defendants violated this provision by representing, during the course its trade and business practices, that the Repairwear Products provide de-aging benefits as described herein, when they do not.

108.   Under Section of the 2 of the UTPA, 815 ILCS 510/2, a person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation, the person "advertises goods or services with intent not to sell them as advertised." 815 ILCS 510/2(a)(9). Defendants violated this provision by representing, during the course its trade and business practices, that the Repairwear Products provide de-aging benefits as described herein, when they do not.

109.   Defendants' deceptive acts and practices, alleged herein, including but not limited to, Defendants' sale of Repairwear Products labeled, packaged, marketed, and advertised as having certain de-aging benefits, and Defendants' failure to disclose that Repairwear Products do not have such de-aging efficacy, violate the ICFA.

110.   Defendants intended for Plaintiff Stein and the other Illinois Subclass members to rely on their aforementioned deceptive acts and practices, and such

deceptive acts and practices occurred in the course of conduct involving trade or commerce.

111.   Plaintiff Stein and the other Illinois Subclass members were exposed to such misrepresentations and were deceived.

112.   Defendants' violation of the ICFA caused Plaintiff Stein and the other Illinois Subclass members to sustain substantial and ascertainable losses of money and/or property and other damages because they were induced to purchase or paid a price premium due to the false and misleading advertising and marketing of Repairwear Products and Defendants' failure to disclose the true nature of said products.

113.   Indeed, Plaintiff Stein's and the other Illinois Subclass members' purchases are of no value because the Repairwear Products do not provide the advertised de-aging benefits.

114.   815 ILCS 505/10a permits the Court to enter injunctive relief to require Defendants to stop the unlawful, unfair and deceptive conduct alleged herein and award Plaintiff Stein and the other members of the Illinois Subclass their costs and reasonable attorneys' fees.

## COUNT IV
### (Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*)

115.   Plaintiffs repeat the allegations contained in paragraphs 1-82 and 100-114 above, as is fully set forth herein.

116.   Plaintiff Stein asserts this claim individually and on behalf of the other Illinois Subclass members.

117.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.*, prohibits unfair methods of competition and unfair and deceptive acts or practices, including among other things, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, . . . whether any person has in fact been misled, deceived or damaged thereby."

118.   Throughout the Class Period, Defendants conducted "trade" and "commerce" within the meaning of 815 ILCS 505/1(f) by its advertising, offering for sale, and sale of Repairwear Products.

119.   815 ILCS. 505/1(b) of the Illinois Consumer Fraud and Deceptive Business Practices Act defines the term "merchandise" to include Repairwear Products.

120.   815 ILCS. 505/1(c) of the Illinois Consumer Fraud and Deceptive Practices defines the term "person" to include Defendants.

121.   815 ILCS 505/1(e) of the Illinois Consumer Fraud and Deceptive Practices Act defines the term "consumer" to include Plaintiff Stein and the other Illinois Subclass members.

122.   Defendants' acts and practices, alleged herein, constitute unfair, deceptive, and/or fraudulent business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, including but not limited to,

Defendants' sale of Repairwear Products labeled, packaged, advertised and marketed as having certain de-aging benefits and Defendants' failure to disclose the true nature of said products.

123.   Defendants intended for Plaintiff Stein and the other Illinois Subclass members to rely on its aforementioned deceptive acts and practices, and such deceptive acts and practices occurred in the course of conduct involving trade or commerce.

124.   Plaintiff Stein and the other Illinois Subclass members were exposed to such misrepresentations and were deceived.

125.   Defendants' violation of the Illinois Consumer Fraud and Deceptive Business Practices Act caused Plaintiff Stein and the other Illinois Subclass members to sustain substantial and ascertainable losses of money and/or property and other damages because they were induced to purchase or paid a price premium due to the false and misleading advertising and marketing of Repairwear Products and Defendants' failure to disclose the true nature of said products.

126.   Indeed, their purchases are of no value because the Repairwear Products do not provide the advertised de-aging benefits.

### COUNT V
### (Breach of Express Warranty)

127.   Plaintiffs repeat the allegations contained in paragraphs 1-82 above, as is fully set forth herein.

128.   Plaintiffs bring this Count individually under the laws of the state where they each respectively purchased Repairwear Products and on behalf of: (a)

all other persons who purchased Repairwear Products in the same State; and (b) all other persons who purchased Repairwear Products in States having similar laws regarding express warranty.

129.   Defendants' representations that the Repairwear Products "deliver 63 percent of the visible wrinkle-reducing power of a laser procedure," "rebuild elasticity or firmness," "rebuild stores of natural collagen," "empower skin to defy gravity," "organize skin into a tighter, stronger network," "intensif[y] natural cellular repair," "mend sun's visible damage," "visibly sculpt jawline," "strengthen and rebuild skin's elasticity and resistance to gravity," "smooth out 'laugh lines' from nose to mouth," "repair lines and wrinkles," or provide the other promised de-aging results as described herein are affirmations by Defendants that the Repairwear Products would deliver the de-aging benefits promised.

130.   Defendants made express representations that Repairwear Products would provide "results guaranteed."

131.   Defendants' representations regarding the Repairwear Products are made to Plaintiffs and the other members of the Class and Subclasses at the point of purchase, are part of the description of the goods, and became part of the basis of the bargain upon which they were purchased by Plaintiffs and the other members of the Class and Subclasses.

132.   The Repairwear Products did not, in fact, meet the representations Defendants made about the Repairwear Products, as described herein.

133.   At all times relevant to this action, Defendants falsely represented that its Repairwear Products "deliver 63 percent of the visible wrinkle-reducing power of a laser procedure," "rebuild elasticity or firmness," "rebuild stores of natural collagen," "empower skin to defy gravity," "organize skin into a tighter, stronger network," "intensif[y] natural cellular repair," "mend sun's visible damage," "visibly sculpt jawline," "strengthen and rebuild skin's elasticity and resistance to gravity," "smooth out 'laugh lines' from nose to mouth," "repair lines and wrinkles," or provide the other promised de-aging results as described herein when they do not, in breach of these express warranties.

134.   At all times relevant to this action, Defendants made false representations in breach of the express warranties and in violation of state express warranty laws, including:

      a.    Ak. St. § 42.02.313.

      b.    Ariz. Rev. Stat. Ann. § 47-2313.

      c.    Ark. Code Ann. § 4-2-313.

      d.    California Commercial Code § 2313.

      e.    Colo. Rev. St. § 4-2-313.

      f.    Conn. Gen. Stat. Ann. § 42a-2-313.

      g.    D.C. Stat. § 28:2-313.

      h.    Fla. Stat. § 672.313

      i.    Haw. Rev. Stat. § 490:2-313.

      j.    810 ILCS 5/2-313.

      k.    Ind. Code § 26-1-2-313.

      l.    Kansas Stat. Ann. § 84-2-313.

      m.    La. Civ. Code. Ann. Art. 2520

  n.  11 Maine Rev. Stat. Ann. § 2-313.

  o.  Mass. Gen. Laws Ann. 106 § 2-313.

  p.  Minn. Stat. Ann. § 336.2-313.

  q.  Miss. Code Ann. § 75-2-313.

  r.  Missouri Rev. Stat. § 400.2-313.

  s.  Mont. Code Ann. § 30-2-313.

  t.  Neb. Rev. Stat. § 2-313.

  u.  Nev. Rev. Stat. § 104.2313.

  v.  N.H. Rev. Stat. § 382-A:2-313.

  w.  N.J. Stat. Ann. § 12A:2-313.

  x.  N.M. Stat. Ann. § 55-2-313.

  y.  N.Y. U.C.C. Law § 2-313.

  z.  N.C. Gen. Stat. Ann. § 25-2-313.

  aa.  Okla. Stat. Ann. Tit. 12A, § 2-313.

  bb.  Or. Rev. Stat. § 72.3130.

  cc.  Pa. Stat. Ann. Tit. 13, § 2313.

  dd.  R.I. Stat. § 6A-2-313.

  ee.  S.C. § 36-2-313.

  ff.  S.D. Cod. Laws. § 57A-2-313.

  gg.  Tenn. Code Ann. § 47-2-313.

  hh.  Tex. Bus. & Com. Code Ann. § 2.313.

  ii.  Ut. Code Ann. § 70A-2-313.

  jj.  Vt. Stat. Ann. § 2-313.

  kk.  Wash. Rev. Code § 62A.2-313.

  ll.  W. Va. Code § 46-2-313.

  mm.  Wyo. Stat. § 34.1-2-313.

135. The above statutes do not require privity of contract in order to recover for breach of express warranty.

136.   As a result of Defendants' conduct, Plaintiffs and the other members of the Class and Subclasses were damaged in amounts to be proven at trial.

## COUNT VI
## (Breach of Implied Warranty)

137.   Plaintiffs repeat the allegations contained in paragraphs 1-82 above, as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

138.   Plaintiffs bring this Count individually under the laws of the state where they each purchased Repairwear Products and on behalf of:  (a) all other persons who purchased Repairwear Products in the same State; and (b) all other persons who purchased Repairwear Products in States having similar laws regarding implied warranties.

139.   The Uniform Commercial Code §2-314 provides that unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. This implied warranty of merchantability acts as a guarantee by the seller that his goods are fit for the ordinary purposes for which they are to be used.

140.   Defendants developed, manufactured, advertised, marketed, sold and/or distributed the Repairwear Products and represented that the Repairwear Products were fit for a particular use, specifically that the Repairwear Products would deliver specified de-aging benefits.   Contrary to such representations, Defendants failed to disclose that the Repairwear Products do not and cannot deliver the de-aging benefits promised.

141.   At all times, the following states listed below, including the District of Columbia, have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability: Ala. Code §7-2-314; Alaska Stat. §45.02.314; Ariz. Rev. Stat. Ann. §47-2314; Ark. Code Ann. §4-2-314; Cal. Com. Code §2314; Colo. Rev. St §4-2-314; Conn. Gen. Stat. Ann. §42a-2-314; 6 Del. C. §2-314; D.C. Code §28:2-314; Fla. Stat. Ann. §672.314; Ga. Code Ann. §11-2-314; Haw. Rev. Stat. §490:2-314; Idaho Code §28-2-314; 810 Ill. Comp. Stat. Ann. 5/2-314; Ind. Code Ann. §26-1-2-314; Iowa Code Ann. §554.2314; Kan. Stat. Ann. §84-2-314; Ky. Rev. Stat. Ann. §355.2-314; La. Civ. Code Ann. art. §2520; 11 Me. Rev. Stat. Ann. §2-314; Md. Code Ann. §2-314; Mass. Gen. Laws Ch. 106 §2-314; Mich. Comp. Laws Ann. §440.2314; Minn. Stat. Ann. §336.2-314; Miss. Code Ann. §75-2-314; Mo. Rev. Stat. §400.2-314; Mont. Code Ann. §30-2-314; Nev. Rev. Stat. U.C.C §104.2314; N.H. Rev. Ann. §382-A:2-314; N.J. Stat. Ann. §12A:2-314; N.M. Stat. Ann. §55-2-314; N.Y. U.C.C. Law §2-314; N.C. Gen. Stat. Ann. §25-2-314; N.D. Stat §41-02-314; Ohio Rev. Code Ann. §1302.27; Okla. Stat. tit. 12A §2-314; Or. Rev. Stat. §72.3140; 13 Pa. Stat. Ann. §2314; R.I. Gen. Laws §6A-2-314; S.C. Code Ann. §36-2-314; S.D. Stat. §57A-2-314; Tenn. Code Ann. §47-2-314; Tex. Bus. & Com. Code Ann. §2-314; Utah Code Ann. §70A-2-314; Va. Code §8.2-314; Vt. Stat. Ann. 9A §2-314; W. Va. Code §46-2-314; Wash. Rev. Code §62A 2-314; Wis. Stat. Ann. §402.314 and Wyo. Stat. §34.1-2-314.

142.   As developers, manufacturers, producers, advertisers, marketers, sellers and/or distributors of "de-aging" products, Defendants are "merchants"

within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

143.   Further, Defendants are merchants with respect to the Repairwear Products.  Defendants developed, manufactured, produced, advertised, marketed, sold and/or distributed the Repairwear Products and represented to Plaintiffs and the Class that it developed the Repairwear Products to "deliver 63 percent of the visible wrinkle-reducing power of a laser procedure," "rebuild elasticity or firmness," "rebuild stores of natural collagen," "empower skin to defy gravity," "organize skin into a tighter, stronger network," "intensif[y] natural cellular repair," "mend sun's visible damage," "visibly sculpt jawline," "strengthen and rebuild skin's elasticity and resistance to gravity," "smooth out 'laugh lines' from nose to mouth," "repair lines and wrinkles," or provide the other promised de-aging results as described herein.  Further, Defendants, by selling the Repairwear Products to Plaintiffs and the Class have held themselves out as a retailer of the Repairwear Products that would provide the specified de-aging benefits and, in fact, have derived a substantial amount of revenues from the sale of the Repairwear Products.

144.   The Repairwear Products are "goods," as defined in the various states' commercial codes governing the implied warranty of merchantability.

145.   As a merchant of the Repairwear Products, Defendants knew that purchasers relied upon them to develop, manufacture, produce, sell and distribute products that would provide the de-aging results promised.

146. Defendants developed, manufactured, produced, sold and distributed the Repairwear Products to consumers such as Plaintiffs and the Class. They knew that the Repairwear Products would be used to provide the de-aging results promised.

147. Defendants specifically represented in their marketing and advertising that the Repairwear Products would "deliver 63 percent of the visible wrinkle-reducing power of a laser procedure," "rebuild elasticity or firmness," "rebuild stores of natural collagen," "empower skin to defy gravity," "organize skin into a tighter, stronger network," "intensif[y] natural cellular repair," "mend sun's visible damage," "visibly sculpt jawline," "strengthen and rebuild skin's elasticity and resistance to gravity," "smooth out 'laugh lines' from nose to mouth," "repair lines and wrinkles," or provide the other promised de-aging results as described herein.

148. At the time that Defendants developed, manufactured, sold and/or distributed the Repairwear Products, Defendants knew the purpose for which the Products were intended and impliedly warranted that the Repairwear Products were of merchantable quality and were fit for their ordinary purpose – providing the de-aging benefits promised.

149. Defendants breached their implied warranties in connection with the sale of the Repairwear Products to Plaintiffs and members of the Class. The Products were not fit for their ordinary purposes and intended use as de-aging products, because the Repairwear Products do not and cannot provide the de-aging benefits promised.

150.   Defendants had actual knowledge that the Repairwear Products do not and cannot provide the de-aging benefits promised and were not fit for their ordinary purpose and Plaintiffs therefore were not required to notify Defendants of their breach.   If notice is required, Plaintiffs and the Class adequately have provided Defendants of such notice through the filing of this lawsuit.

151.   As a direct and proximate result of Defendants' breach of implied warranties, Plaintiffs and other members of the Class have been injured.   Plaintiffs and the other members of the Class would not have purchased the Repairwear Products but for Defendants' representations and warranties.   Defendants misrepresented the efficacy of the Repairwear Products, which caused injuries to Plaintiffs and the other Class members because either they paid a price premium due to the deceptive advertising and false promises of efficacy, or they purchased products that did not perform as promised and therefore had no value to Plaintiffs and the other Class members.

## COUNT VII
### (Unjust Enrichment)

152.   Plaintiffs repeat the allegations contained in paragraphs 1-82 above, as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

153.   Plaintiffs bring this claim individually, as well as on behalf of the members of the nationwide Class, and respectively on behalf of the Connecticut, New Jersey, and Illinois Subclasses against Defendants.

154.   Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and the other Class and Subclass members' purchases of the Repairwear Products, which retention under these circumstances is unjust and inequitable because Defendants misrepresented the efficacy of the Repairwear Products, which caused injuries to Plaintiffs and the other Class and Subclass members because either they paid a price premium due to the deceptive advertising and false promises of efficacy, or they purchased products that did not perform as promised and therefore had no value to Plaintiffs and the other Class and Subclass members.

155.   Plaintiffs and the other Class and Subclass members conferred a benefit on Defendants by purchasing one or more of the Repairwear Products.

156.   Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class and Subclass members' purchases of the Repairwear Products, which retention under these circumstances is unjust and inequitable because Defendants misrepresented the efficacy of the Repairwear Products, which caused injuries to Plaintiffs and Class and Subclass members because either they paid a price premium due to the deceptive advertising and false promises of efficacy or they purchased products that did not perform as promised and were therefore of no value.

157.   Because Defendants' retention of the non-gratuitous benefit conferred on it by Plaintiffs and the other Class and Subclass members is unjust and

inequitable, Defendants must pay restitution to Plaintiffs and the other Class and Subclass members for their unjust enrichment, as ordered by the Court.

## COUNT VIII
### (Violation of the Consumer Fraud Laws of the Various States)

158.   Plaintiffs repeat the allegations contained in paragraphs 1-82 as if fully set forth herein.

159.   In addition to and/or in the alternative to the foregoing counts asserted, Plaintiffs bring this count individually under the law of the State in which each respectively purchased Repairwear Products and on behalf of all other persons who purchased Repairwear Products in States with similar consumer protection laws.

160.   Plaintiffs and each of the other Class members is a consumer, purchaser, or other person entitled to the protection of the consumer protection laws of the State in which he or she purchased the Repairwear Products.

161.   The consumer protection laws of the State in which each Plaintiff and the other Class member(s) purchased the Repairwear Products declares that unfair or deceptive acts or practices, in the conduct of trade or commerce are unlawful.

162.   Thirty-seven states and the District of Columbia have enacted statutes designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising and that allow consumers to bring private and/or class actions.  These statutes are found at:

> a.   Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.*;

b.      Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.*;

c.      California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*;

d.      Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*;

e.      Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.*;

f.      Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.*;

g.      District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28 3901, *et seq.*;

h.      Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;

i.      Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1, *et. seq.*, and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.*;

j.      Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.*;

k.      Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

l.      Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.*;

m.      Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.*;

n.      Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

o.     Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.*,

p.     Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;

q.     Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

r.     Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.*; and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;

s.     Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

t.     Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et seq.*;

u.     Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59 1601, *et seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.*;

v.     Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*;

w.     New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*;

x.     New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 1, *et seq.*;

y.     New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 1, *et seq.*;

z.     New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

aa.     North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.*;

bb.    Ohio Rev. Code Ann. §§ 1345.02 and 1345.03; Ohio Admin. Code §§ 109:4-3-02, 109:4-3-03, and 109:4-3-10;

cc.    Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.*;

dd.    Oregon Unfair Trade Practices Act, Ore. Rev. Stat § 646.608(e) & (g);

ee.    Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;

ff.    South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.*;

gg.    South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 1, *et seq.*;

hh.    Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.*;

ii.    Washington Consumer Fraud Act, Wash. Rev. Code § 19.86.010, *et seq.*;

jj.    West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.*;

kk.    Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, *et seq.*

163.    The Repairwear Products constitute products to which these consumer protection laws apply.

164.    In the conduct of trade or commerce regarding their production, marketing, and sale of the Repairwear Products, Defendants engaged in one or more unfair or deceptive acts or practices, including, but not limited to, uniformly representing to Plaintiffs and each Class member by means of its advertising, marketing and other promotional materials, and on the packaging and labeling of

58

the Repairwear Products that Repairwear Products would "deliver 63 percent of the visible wrinkle-reducing power of a laser procedure," "rebuild elasticity or firmness," "rebuild stores of natural collagen," "empower skin to defy gravity," "organize skin into a tighter, stronger network," "intensif[y] natural cellular repair," "mend sun's visible damage," "visibly sculpt jawline," "strengthen and rebuild skin's elasticity and resistance to gravity," "smooth out 'laugh lines' from nose to mouth," "repair lines and wrinkles," or provide the other promised de-aging results as described herein.

165.   Defendants' representations and omissions were false, untrue, misleading, deceptive, and/or likely to deceive.

166.   Defendants knew, or should have known, that their representations and omissions were false, untrue, misleading, deceptive and/or likely to deceive.

167.   Defendants used or employed such deceptive and unlawful acts or practices with the intent that Plaintiffs and members of the Class rely thereon.

168.   Each Plaintiff and the other Class members purchased Repairwear Products produced by Defendants which misrepresented the characteristics and nature of the products.

169.   Plaintiffs and the other Class members would not have purchased the Repairwear Products but for Defendants' deceptive and unlawful acts.

170.   As a result of Defendants' conduct, Plaintiffs and the other Class members sustained damages in amounts to be proven at trial.

171.   Defendants' conduct showed complete indifference to, or conscious disregard for, the rights and safety of others such that an award of punitive and/or statutory damages is appropriate, under the consumer protection laws of those states that permit such damages to be sought and recovered.

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment in their favor against Defendants, as follows:

A.     For an order certifying the nationwide Class and/or the Connecticut, New Jersey, and Illinois Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the Class and/or Subclass members;

B.     For an order declaring that Defendants' conduct violates the statutes referenced herein;

C.     For an order finding in favor of Plaintiffs, the nationwide Class, and/or the Connecticut, New Jersey, and Illinois Subclasses on all counts asserted herein;

D.     For an order awarding statutory, compensatory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

E.     For prejudgment and post-judgment interest on all amounts awarded;

F.     For an order of restitution and all other forms of equitable monetary relief;

G.     For injunctive relief as pleaded or as the Court may deem proper; and

H.     For an order awarding Plaintiffs, the nationwide Class, and/or the Connecticut, New Jersey, and Illinois Subclasses their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all claims so triable.


Dated: April 8, 2013                             CARELLA, BYRNE, CECCHI,
                                                 OLSTEIN, BRODY & AGNELLO, P.C.


                                        By: */s/ Caroline F. Bartlett*
                                             Caroline F. Bartlett
                                             James E. Cecchi
                                             Zachary S. Bower
                                             CARELLA, BYRNE, CECCHI,
                                             OLSTEIN, BRODY & AGNELLO,
                                             P.C.
                                             5 Becker Farm Road
                                             Roseland, New Jersey 07068
                                             (973) 994-1700

                                             Joseph P. Guglielmo (CT 27481)
                                             David R. Scott (CT 16080)
                                             Maria K. Tougas (CT 05624)
                                             Erin Green Comite (CT 24886)
                                             SCOTT+SCOTT,
                                             Attorneys at Law, LLP
                                             156 South Main Street
                                             P.O. Box 192
                                             Colchester, CT  06415
                                             (860) 537-5537

                                             Paul M. Weiss
                                             Richard J. Burke
                                             COMPLEX  LITIGATION
                                             GROUP, LLC
                                             513 Central Avenue, Suite 300

Highland Park, Illinois 60035
(847) 433-4500

Stephen A. Weiss
Jonathan Shub
Scott A. George
SEEGER WEISS LLP
77 Water Street
New York, New York 10005
(212) 584-0700

Jay W. Eisenhofer
Robert G. Eisler
GRANT & EISENHOFER, P.A.
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000

Adam J. Levitt
GRANT & EISENHOFER, P.A.
30 North LaSalle Street, Suite 1200
Chicago, Illinois 60602
(312) 214-0000

Mark Gardy
Meagan Farmer
GARDY & NOTIS, LLP
501 Fifth Avenue, Suite 1408
New York, New York 10017
(212) 905-0509

Joe R. Whatley, Jr.
Patrick J. Sheehan
WHATLEY KALLAS
380 Madison Avenue, 23rd Floor
New York, New York 10017
(212) 447-7060

Filename:            DOCSLIB-#499656-v3-
   Master_Consolidated_ComplaintII.doc
Directory:           C:\Users\bhawkes\AppData\Roaming\BP\pdfDocs\Import
Template:
                     C:\Users\bhawkes\AppData\Local\Microsoft\Windows\Te
   mporary Internet Files\Content.MSO\1AD10137.dotm
Title:
Subject:
Author:              ZBOWER
Keywords:
Comments:
Creation Date:       4/8/2013 5:12:00 PM
Change Number:       2
Last Saved On:       4/8/2013 5:12:00 PM
Last Saved By:       Brian Hawkes
Total Editing Time:  0 Minutes
Last Printed On:     4/8/2013 5:14:00 PM
As of Last Complete Printing
   Number of Pages: 62
   Number of Words:        11,481 (approx.)
   Number of Characters:   65,448 (approx.)